In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1163 & 99-1823

Brian Zentmyer,

Plaintiff-Appellant,

v.

Kendall County, Illinois, Richard Randall,
Sheriff of Kendall County, Deputy Hawkins,
Deputy Gawne, Deputy Hetzel, Deputy Flowers,
Deputy Pfister, Deputy Walton, Deputy Howe,
Deputy Blank and Deputy Klebba,

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 2831--David H. Coar, Judge.

Argued January 4, 2000--Decided June 13, 2000

   Before Cudahy, Kanne and Diane P. Wood, Circuit
Judges.

   Kanne, Circuit Judge.  While incarcerated as a
pretrial detainee at the Kendall County jail,
Brian Zentmyer contracted an ear infection that
he claims led ultimately to permanent hearing
loss in his right ear. Zentmyer brought suit
under 42 U.S.C. sec. 1983 against his jailers
claiming that they violated his Fourteenth
Amendment rights and displayed deliberate
indifference to his health in treating his
infection. Namely, Zentmyer cites the jail
deputies' failure to administer prescription
antibiotics to him on a number of occasions. We
affirm summary judgment in favor of the
defendants and hold that the defendants' actions
fell short of the deliberate indifference
standard for liability under the Fourteenth
Amendment.

I.  History
   Each morning at the Kendall County jail,
deputies check each inmate for medical complaints
and register any complaints on a sick call form.
Deputies forward emergency complaints directly to
the commanding officer, who then decides whether
to summon a doctor for immediate care. Routine

complaints are recorded for the attention of the jail nurse, who visits twice weekly. If necessary, the nurse may transfer an ailing inmate to a nearby medical facility, request a doctor's visit or order non-prescription medication for the inmate. As required, deputies dispense medication to inmates in accordance with the nurse's or doctor's orders. No particular deputy is designated to give medication to inmates, but instead any deputy on duty at the time is authorized to administer medication as scheduled in the shift log. Jail officials record each inmate complaint, medical examination and administration of medication.

After arresting him for residential burglary, Kendall County police booked Brian Zentmyer into the Kendall County jail as a pretrial detainee on January 22, 1995. Three months later, during the evening of April 18, 1995, Zentmyer complained to Deputy Dave Gawne that he had an earache. Observing no ear discharge, swelling or signs of emergency, Gawne suggested that Zentmyer go on sick call the next morning and reported Zentmyer's complaint in the shift log, advising the subsequent deputy on duty to notify the nurse. The next morning, Zentmyer followed Gawne's instruction by asking Deputy Jim Hetzel to place him on sick call and call the nurse. According to jail officials, however, several deputies miscommunicated over the radio, and as a result, Zentmyer was not placed on sick call and did not see Nurse Marlis Schumacher that day. Zentmyer complained to Deputies Chris Pfister and Rick Flowers later that afternoon, but Pfister apologized that the nurse had already left the jail. Pfister gave painkilling medication to Zentmyer and wrote in the shift log that the nurse should examine Zentmyer during her next visit.

On April 20, 1995, Zentmyer again complained to Hetzel, but the nurse had taken a vacation day and was unavailable. The next morning, Zentmyer voiced no complaint when Deputy Tim Walker surveyed the inmates for medical care. However, later that day, Zentmyer told Deputy Charles Walton that he was in pain and asked to see a doctor. Walton checked with Sergeant James Howe who, after consulting Commander Michael Hawkins, ordered the next shift's deputies to take Zentmyer to the local hospital. Around 10 a.m. on April 22, 1995, Hetzel accompanied Zentmyer to the emergency room of the Sandwich Community Hospital.

Dr. Deenadayal Gaddam noticed inflammation in Zentmyer's right ear but did not see any swelling, discharge, boils, blockage or other signs of injury. Zentmyer reported no hearing

loss and exhibited no signs of inner-ear infection. Gaddam diagnosed Zentmyer as suffering only from otitis externa and otitis media, infections of the outer and middle ear. Gaddam later testified that Zentmyer's condition, if left untreated over time, could have cleared up by itself but might instead have worsened and led potentially to hearing loss. Gaddam prescribed the oral antibiotic Amoxicillin for the middle-ear infection, to be taken once every eight hours for ten days (eleven days counting the day of prescription), and the antibiotic eardrop Otocort for the outer-ear infection, four drops to be administered to the ear four times daily until the bottle was empty. Gaddam also directed Zentmyer to see a physician in two weeks and take Tylenol for pain or fever. Hetzel and Zentmyer returned to the jail by 11 a.m., less than an hour later.

Gaddam testified later that Amoxicillin must be taken consistently to be effective, but acknowledged that the ear infection would have been treated so long as Zentmyer ingested all thirty pills of Amoxicillin in the days following the prescription, even if not taken every eight hours. Zentmyer received the prescribed dose of Amoxicillin on seven of the eleven days/1 following the hospital visit and eventually took the entire thirty-pill bottle of Amoxicillin. Gaddam also testified that three applications of Otocort a day would be sufficient for treatment because doctors "prescribe four times hoping [their patients] will take it three times." Zentmyer received the prescribed doses of Otocort on seven of twenty days following his hospital visit, and received at least three doses on four of the remaining thirteen days during that period. Each day, Zentmyer received at least two painkillers a day in addition to his prescription medication.

Realizing that he was not taking his medication exactly according to prescription, Zentmyer complained to Deputy Pfister on April 27, 1995, and warned that he would sue if he did not receive his medication on schedule. According to Pfister, Zentmyer became "frustrated, seemed upset and started pacing back and forth." Pfister told him to let the guards know if he needed medical attention, but Zentmyer responded that it was the duty of the deputies to administer medication and his lawyer had advised him not to ask the deputies for medication. As he had been trained, Pfister instructed Zentmyer to address him as "Deputy Pfister" and told Zentmyer that he would be placed in isolation if he kept complaining. When Zentmyer remained agitated, Pfister decided to "[l]et him vent" because "[a]ll inmates vent" and Pfister "didn't feel

that [Zentmyer] needed disciplinary action." Zentmyer continued venting and threatened, "You just wait, I'm going to get you in court." Indeed, Zentmyer's lawyer had already contacted Commander Hawkins to protest Zentmyer's treatment. As a result, Hawkins investigated by questioning Deputies Pfister, Hetzel and Tara Lamons, but each answered that Zentmyer was receiving medication as prescribed.

Zentmyer also complained about his ear to Flowers on April 26, 1995, to Gawne on May 1, 1995, and to Deputy Sabrina Forman on May 2 and 3, 1995. On May 3, 1995, Nurse Schumacher examined Zentmyer, who complained of an earache, headache and bleeding from the ear. Schumacher noticed no bleeding but found yellow drainage in Zentmyer's right ear, so she scheduled a visit by Dr. Jose Trevino for two days later. Trevino found that the middle-ear infection had healed, but diagnosed Zentmyer as still suffering from an outer-ear infection and prescribed the antibiotics Biaxin and Elocon, each to be taken twice daily.

From May 6 to May 11, 1995, jail deputies administered the prescribed amounts of Biaxin and Elocon on five of six days./2 On May 11, 1995, Zentmyer transferred to the Kane County jail for temporary detainment until a May 16 transfer to a State of Illinois prison. During medical screening, Zentmyer did not report any hearing loss, but the Kane County jail doctor noted Zentmyer's outer-ear infection and recommended that he continue his medication.

Three months later, on August 9, 1995, Dr. Perry Santos examined Zentmyer's right ear after Zentmyer complained again of pain. In his report, Santos observed that "[t]here is an excoriated area" in the right ear "most consistent with a fingernail scratch." He found "no inflammation or erythema or evidence of acute infection as well as no evidence of chronic infection." Santos explained that there was no evidence of active outer-ear infection but there could be tenderness associated with a recently healed infection. On February 15, 1996, Dr. L. El-Diery examined Zentmyer and detected no perforation of the eardrum but noticed some ear trauma that he suspected was caused by "manipulation of the external ear canal with the placement of foreign bodies by the inmate."

On April 15, 1996, Zentmyer was examined yet again, this time by Dr. Robert Kramer who declared Zentmyer's ear "absolutely normal" with no evidence of infection. Nonetheless, Zentmyer continued to report pain and hearing loss. On Kramer's request, audiologist Kathy Betestini

tested Zentmyer's hearing with a standard audiogram and found that Zentmyer reported no hearing at all in his right ear. Two years later, audiologist David Lewis performed another audiogram on Zentmyer and also found that Zentmyer reported no hearing in his right ear. However, suspicious of Zentmyer's responses, Lewis conducted a second hearing test which "did not reveal that [Zentmyer's hearing] is as bad as Mr. Zentmyer is claiming."

On April 22, 1997, Zentmyer sued the defendants in district court under 42 U.S.C. sec. 1983 claiming that he was denied adequate medical care in violation of his Eighth and Fourteenth Amendment rights. Zentmyer argued that as a result of the defendants' deliberate indifference to administering his medication properly, the medication was rendered "useless" and he sustained a "totally dead" right ear. The district court immediately dismissed Zentmyer's Eighth Amendment claims, and on December 22, 1998, granted the defendants' motion for summary judgment on Zentmyer's Fourteenth Amendment claims.

II.  Analysis

The Eighth Amendment proscription on the infliction of cruel and unusual punishment requires that the government "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994). Among other things, these principles prohibit jail guards from "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).

However, liability results only when the defendant exhibits "deliberate indifference to serious medical needs." Id. at 104; see also Henderson v. Sheahan, 196 F.3d 839, 844 (7th Cir. 1999). In Farmer, the Supreme Court explained that an inmate must satisfy a two-prong test to establish an Eighth Amendment claim: (1) the deprivation alleged must be objectively serious; (2) the prison official must have exhibited deliberate indifference to the inmate's health or safety. Farmer, 511 U.S. at 834. Although the Eighth Amendment does not extend to pretrial detainees like Zentmyer, the Due Process Clause of the Fourteenth Amendment protects pretrial detainees under the same standard as the Eighth Amendment. See Henderson, 196 F.3d at 844 n.2; Payne v. Churchich, 161 F.3d 1030, 1041 (7th Cir. 1998). Zentmyer appeals summary judgment on his Fourteenth Amendment claim "as to the individual

deputies in their individual capacities" and argues that the defendants' failure to administer medication exactly as prescribed constituted deliberate indifference to serious medical needs. We review de novo the district court's grant of summary judgment and draw all reasonable and justifiable inferences in favor of the non-moving party Zentmyer. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Reed v. McBride, 178 F.3d 849, 852 (7th Cir. 1999).

An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997) (citation and internal quotation omitted). Failure to "dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue--the sorts of ailments for which many people who are not in prison do not seek medical attention--does not . . . violate the Constitution." Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996). Although an ear infection is a common malady that typically causes no permanent impairment, Zentmyer's condition inflicted prolonged suffering and required treatment from a nurse and two doctors who prescribed painkillers and antibiotics for almost a month. Zentmyer also adduced evidence and expert testimony indicating that the infections lingered for months afterward and led eventually to a permanent loss of hearing. Defendants cite credible evidence that Zentmyer's ear infection was mild at worst and that Zentmyer actually did not sustain hearing loss. However, resolving all factual ambiguities in his favor, we agree that Zentmyer raised a material question of fact whether he suffered from an objectively serious medical condition.

To overturn summary judgment, Zentmyer also must demonstrate a genuine question of fact whether the defendants were deliberately indifferent to his medical condition. The Court explained in Farmer that "deliberate indifference entails something more than mere negligence." Farmer, 511 U.S. at 836; see also Pope v. Shafer, 86 F.3d 90, 92 (7th Cir. 1996); Williams v. O'Leary, 55 F.3d 320, 324 (7th Cir. 1995); Giron v. Corrections Corp. of Am., 191 F.3d 1281, 1286 (10th Cir. 1999). For example, in Steele v. Choi, 82 F.3d 175, 178 (7th Cir. 1996), a prison doctor was not deliberately indifferent, even assuming that a minimally competent doctor would have been able to identify and treat the plaintiff's injury under the circumstances, because he was not subjectively aware of the plaintiff's medical needs. Under this standard, "a prison official

cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Zentmyer cites the Court's prohibition in Estelle on "intentionally interfering with the treatment once prescribed," Estelle, 429 U.S. at 105, and claims that the deputies are liable because they collectively did not follow the doctors' orders in dispensing his medication. Zentmyer points out that in total he missed five pills of Amoxicillin out of thirty pills prescribed over eleven days; twenty-six applications of Otocort out of eighty applications prescribed over twenty days; and one dose each of Biaxin and Elocon out of ten doses prescribed for each over six days.

However, Zentmyer does not contend that any of the deputies named as defendants knew that Zentmyer might suffer serious injury or pain from the missing doses of medication. In fact, there is no evidence that any deputy thought missing doses of medication for an ear infection would cause a serious injury or loss of hearing. The doctors did not communicate to the deputies that the medication must be constantly applied or else be rendered useless, and Zentmyer admits that none of the defendants noticed any pus, discharge or other physical signs of injury from his ear infection. A string of negligent acts can evidence a plaintiff's exposure to a serious risk and a prison official's awareness of such exposure, but "showing deliberate indifference through a pattern of neglect entails a heavy burden." Dunigan ex rel. Nyman v. Winnebago County, 165 F.3d 587, 591 (7th Cir. 1999). Furthermore, liability under sec. 1983 arises only when the plaintiff can show that the defendant was "personally responsible for a deprivation of a constitutional right." Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996). Zentmyer does not present evidence that any individual defendant failed to administer so many doses that the defendant's actions by themselves instantiate deliberate indifference, nor does Zentmyer allege any agreement among the defendants to deprive him of medical care. Instead, Zentmyer argues that he missed some medication and the deputies collectively were responsible for administering it.

The deputies' failure to dispense Zentmyer's medication consistently on schedule does not manifest conscious disregard for Zentmyer's

health. They responded to Zentmyer's complaints and administered most of his medication according to schedule. The deputies gave him painkillers at least twice a day for twenty days and administered 97 of 130 doses of prescription medication on schedule as prescribed. In total, the deputies administered medication of various forms to Zentmyer 162 times over twenty days from April 22 to May 11, 1995. Zentmyer was treated by medical professionals and received antibiotics and painkillers regularly for a month. Indeed, Dr. Trevino concluded that Zentmyer's middle-ear infection had healed promptly under the deputies' care. Based on the record before us, each of several jail guards failed occasionally to administer doses of medicine without knowledge that serious consequences might result from their lack of diligence in treating an earache. Failing to dispense medication exactly as prescribed may constitute negligence, see Jones v. United States, 91 F.3d 623, 625 (3d Cir. 1996), but "the presence of multiple acts of negligence is merely evidentiary; it is not an alternative theory of liability." Sellers v. Henman, 41 F.3d 1100, 1103 (7th Cir. 1994). Given that the deputies knew only that Zentmyer suffered from an ear infection, the deputies were not so neglectful that deliberate indifference is apparent under the facts alleged. See Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18 (1st Cir. 1995) (finding that failure to administer prescription medication did not constitute deliberate indifference absent evidence that prison officials knew the plaintiff would suffer serious medical consequences without medication).

This is not to say that prison officials may substitute their judgments for a medical professional's prescription. Of course they cannot. See Ralston v. McGovern, 167 F.3d 1160, 1162 (7th Cir. 1999); Johnson v. Hay, 931 F.2d 456, 461 (8th Cir. 1991). If a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference. But deliberate indifference is an onerous standard for the plaintiff, and forgetting doses of medicine, however incompetent, is not enough to meet it here. Zentmyer cites several cases from other circuits decided before Estelle and Farmer finding that denial of prescribed medication, when combined with other privations, violated a prisoner's substantive due process rights. None of these cases hold that failure to administer medication exactly as prescribed without additional exacerbating hardships violates the Eighth or Fourteenth Amendment. See Campbell v. Beto, 460 F.2d 765 (5th Cir. 1972); Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970); Tolbert v.

Eyman, 434 F.2d 625 (9th Cir. 1970); Edwards v. Duncan, 355 F.2d 993 (4th Cir. 1966).

Lastly, the district court properly granted summary judgment for Commander Hawkins on Zentmyer's Fourteenth Amendment claim. For liability, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye," so Hawkins can be liable as a supervisor only if Zentmyer demonstrates that constitutionally deficient medical care occurred at Hawkins's direction or with his knowledge and consent. Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995). Zentmyer's attorney telephoned Hawkins about Zentmyer's earache and treatment, but Hawkins investigated the complaint and was told by three deputies that Zentmyer was receiving medication as prescribed. Under the circumstances, Hawkins reasonably believed his deputies' reports and otherwise had no involvement with Zentmyer's medical care.

III. Conclusion

For the foregoing reasons, we Affirm the decision of the district court granting the defendants' motion for summary judgment.

/1 Zentmyer took three pills of Amoxicillin a day on six days. Gaddam prescribed Amoxicillin and Otocort around midday on April 22, so Zentmyer received only two pills of Amoxicillin and only three applications of Otocort during the remaining half day. Similarly, Zentmyer received only one application of Otocort before his midday departure from the jail on May 11.

/2 Zentmyer received one dose of each on May 6 after his 4:20 p.m. appointment with Trevino and one dose of each on May 11 before his midday discharge from the jail. Zentmyer received the prescribed two doses of both Biaxin and Elocon on all the remaining days except May 7, when he received only one dose of each.

Diane P. Wood, Circuit Judge, concurring in part and dissenting in part. I agree that the district court correctly dismissed Brian Zentmyer's sec.

1983 action with respect to all of the defendants except Deputy Chris Pfister. With respect to him, however, I find disputed issues of fact that require this case to proceed to trial. I therefore dissent with respect to the disposition of that single claim.

Construing the record in favor of Zentmyer, as we must on this review of summary judgment, I agree with the majority that Zentmyer raised a material question of fact as to whether he suffered a serious medical need. Two doctors, Dr. Gaddam and Dr. Kramer, testified that Zentmyer's ear infection could cause permanent hearing loss if improperly treated. Both doctors also offered the medical opinion that antibiotics must be administered on time to be effective (Dr. Gaddam stated specifically that the medication had to be given within two hours of the prescribed time).

The next question, as the majority notes, is whether Zentmyer raised a material issue of fact with respect to the deliberate indifference of any or all of the defendants. Here I part company with them. It is true that it will not be easy for Zentmyer to convince a trier of fact that Deputy Pfister displayed deliberate indifference to his serious medical need. He will have to prove that Pfister was aware that substantial harm could result from failing to administer the medication correctly, and that he then purposefully did not give it to Zentmyer according to schedule. See Steele v. Choi, 82 F.3d 175, 178 (7th Cir. 1996) (internal citations omitted). What Zentmyer does not have to do is produce a direct admission of deliberate indifference from Pfister. As is true for everything else in the case, circumstantial evidence may also be used to prove that the defendant was aware of the substantial risk to Zentmyer's health and deliberately disregarded that risk. See Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996).

Zentmyer offered evidence that Pfister knew that on April 22, 1995, Dr. Gaddam prescribed antibiotics which Zentmyer was to take three times daily (Amoxicillin) and four times daily (Otocort). Jail records show clearly that the officials did not administer the medication according to the prescription. Zentmyer also offered evidence that the deputies (including Pfister) knew that as of May 5, 1995, the infection had not cleared up, because that was when Dr. Trevino prescribed Biaxin and Elocon cream to be administered twice daily, and this prescription too appeared on jail records. Again, despite the fact that this was the second go-round of antibiotic treatment, the medications were not administered correctly. Pfister, when

questioned about his treatment of Zentmyer, said that it was his policy to treat inmates as well as they treated him, and that Zentmyer did not treat him too well. Pfister then added that "[Zentmyer] received a lot of medication. I have a grandmother. I don't think she's taken this much medication."

It is true that a jury would be entitled to find, based on this evidence, that "[t]he deputies' failure to dispense Zentmyer's medication consistently on schedule does not manifest conscious disregard for Zentmyer's health." Ante at 10. We may not, however, resolve that question of material fact at the summary judgment stage. This is not a cut and dried situation, where a record of perfectly good treatment was followed by a few isolated occurrences of neglect. See Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997). The record shows that Zentmyer's medication was distributed arbitrarily from the beginning of his treatment. This is also not a case devoid of evidence that Pfister was aware of the risks posed by lack of treatment. Two doctors prescribed antibiotics for Zentmyer. Zentmyer continuously complained of pain, and of not receiving his medication at the prescribed times. Pfister admitted to what a reasonable person might construe as a motive to ignore Zentmyer's plight, since he apparently viewed Zentmyer as a hypochondriac and had resolved to engage in some kind of tit-for-tat treatment of Zentmyer (i.e. Zentmyer behaved badly to him, and so he would behave badly to Zentmyer). In the face of this evidence, the fact that Pfister never noticed effusive bleeding or pus in Zentmyer's ear is not conclusive on the question of deliberate indifference. HIV, heart disease, and many other ailments are often not visible to the human eye, and it was not up to Pfister or any other deputy to second-guess the doctors' decisions about prescription medicine.

These disputed issues of fact are enough to allow Zentmyer's claim against Pfister to go forward. I respectfully dissent with respect to the disposition of that claim, and I concur in the remainder of the court's opinion.